Multidistrict litigation case. I see the appellant is ready and able. Thank you. May it please the court, Matthew Wessler for the appellant. With the court's permission, I'd like to reserve three minutes of rebuttal. You might bring the mic closer to you. Yes, Your Honor. With the court's permission, I'd like to reserve three minutes. You'll just have to watch your own time. I will. Thank you. For ten years, the amount of Herceptin contained in a package sold in the United States matched what Genentech put on its label. But in 2009, that changed. Although the company continued to tell health care providers and patients that its packages contained at least 440 milligrams of the drug, that was false. More than 80% were underfilled. The consumer protection claims in this case seek to hold Genentech to what its label promised. The district court held that these claims were preempted by the Federal Food, Drug, and Cosmetic Act under two different theories. First, that the claims posed an obstacle to the purposes and objectives of the FDCA, and second, that it would be impossible for Genentech to comply with the state consumer protection laws without violating federal law. Neither theory of preemption is correct. Under the Supremacy Clause and our system of dual sovereignty, federal laws may only displace the decisions of sovereign states where it is absolutely clear that a state law confers rights or imposes restrictions that conflict with the federal law. But as the Supreme Court reiterated just again last week, in the absence of any such clear conflict, federal law cannot serve as a basis for eliminating state law claims. There is, in other words, no form of preemption that authorizes a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives to displace state law. Before we get too far into the theory, I'm sort of back on the facts. Do we have a factual dispute here as to what federal regulation applies? And before we can say how that squares with the state action, that is, if there is preemption, we have to know where we start. And that all gets back to, is this liquid or is this solid? Right, well, well, we think that this is a liquid, but I think even if you accept Genentech's position on this, and the district court did, that it was a solid, and so as a result, it's 21 CFR section 201.51 that controls. The key problem with the district court's conclusion here, and Genentech's argument, is that the FDCA itself is not an obstacle preemption statute. In other words, it may set a floor for what is required, even if what we're talking about is a solid, but it does not also set a ceiling. And under the FDCA, state laws are entirely appropriate. And in fact, Congress intended state laws to work in tandem with the FDCA to impose higher standards than might be otherwise required by federal law. But we get into this substantial variation that's permitted if it's a solid. And if it's a liquid, you have to be more precise, as I understand it. Yes, Your Honor, that's correct. But even if you take, again, Genentech's view that there is a reasonable variation built into the statute, two responses to that argument. The first is that even if Genentech was right, that the FDA interprets reasonable variation to permit a downward limit below 440 milligrams. They say it goes down to 405. We think that's wrong, and I'd like to explain why. But even if you accept the strongest form of their argument, that is still a floor. There is nothing about that particular requirement that in and of itself displaces federal law. And I think that not only do you have Wyeth and Merck that demonstrate, I think, unambiguously that when Congress passed the FDCA, it did not at all intend any of the FDA's regulations or regulatory rulemaking process to displace state law. But you also have this court's recent decision in Utah Native Plant Society, which again was an obstacle preemption case. So the same kind of preemption theory that we have here. And what this court said in that case, which is 2019, is that in order for a regulation to actually exert preemptive effect, the regulation must be manifestly clear that that's what the agency is intending. Well, the problem I have here, and I have a lot of problems with this case, I think it's very difficult. The argument that the state is making, that you're making, it seems to square with what the FDA is asserting should be the applicable measure. Correct. So I don't understand how there's an obstacle if you're agreeing with the FDA who regulates the drug. Judge Briscoe, that I think is exactly right. What we know about the way the FDA interprets this regulation is that companies are not allowed to go below what they say on the label. We know that the FDA said that in 2014. It said that in 2015. It told Genentech that its label was misleading and that it was not in compliance even with the regulation that the district court and Genentech say can exert preemptive effect. Let me interrupt. The district court said you can't rely on the 2014 rule because that would be unfair because you would be applying it retroactively. Right. What's your response? So the FDA doesn't take that position. The FDA said and told Genentech this has always been our view. It is not a change in how we interpret the regulation, number one. Number two, even if Genentech thought that this was a change in the way the FDA interpreted the regulation, we have to get back to the first principle here, which is the starting point for all of manufacturers labeling under the FDCA is state law applies. So Genentech has to know at the beginning, before we get into litigation in this case, not only do I have to comply with the FDCA and its implementing regulations, I also have to comply with state law. That is a fundamental feature of the FDCA. And there's only one way, there are two, but one way Congress in this context can change that starting point, which is to pass an express preemption clause. If in fact Congress didn't want Genentech to have to worry about what its obligations might be under state law, it can do what it's done in other contexts in the FDCA, which is to expressly preempt state law. And in this case, we don't have that here. We have examples where Congress has said, you know what, we're concerned with the possible disuniformity that might apply if state laws, you know, were to come into play here. So we will expressly preempt those laws. They've done that for medical devices. They've done that for non-prescription drugs. What they have not done, though, is the same thing for prescription drugs in this context when it comes to Genentech's labeling here. So if we agreed with you on obstacle preemption, we'd still have to look at impossibility preemption. Correct. And so the contention of the other party, of Genentech, is that they would have to get permission from the FDA before they could make any modifications to their process or their label. Correct. And that therefore it fails under impossibility preemption. Right. So that that's their argument, but it's it's wrong in several, I think, quite clear ways. The first reason we know it's wrong is they were doing exactly what we say they should have done for a decade before 2009. But I couldn't find anything in the record that that tells me what was, what they were doing to achieve that result. Is that just, and I wasn't reading it? No, you're, Judge McHugh, you're exactly right. We do not know. We do not know because Genentech, when it started underfilling these vials, declined to take and undertake an investigation to figure out what the problem was. That's significant for impossibility preemption, because what we know from Merck, the lesson from the Supreme Court's recent decision in Merck, is that, number one, the defendant bears a demanding burden to prove actual impossibility. And that means not just that there's a possibility of impossibility. That's not enough. What you need to show, with clear evidence, is the only way you could comply with the state law obligation would be to do something that would violate federal law. Well, let me, let me ask you this. In, in the licensing information that was approved by FDA, things are generally in ranges, right? So, is it your position that they could increase the concentration of trastuzumab? I don't know if I'm saying that right. Let's call it the drug protein. Just T. I've been calling it T. Without violating, if they stay within the ranges, which I think is 25 plus or minus 1. Yes. So, that would be 24 to 26. Yes. It's your position. They can move around within that range without needing permission. Yes, exactly right. And not only that, we know that they have done that before. There are multiple examples where a particular facility came in under that 440 number, and they, they increased the concentration, the target fill weight, to get it up without needing to go through additional FDA approval. There isn't any regulation. Not only do we not do, has Genentech come forward with, with no evidence to demonstrate that there is only one way for them to comply, and that is some specific change that would require FDA approval. What about the, the testimony of their Dana Swisher and, and Dr. Lynn? Yes. I mean, there's some pretty specific testimony there, and that they would have to make some changes that would have to be approved. And I didn't see that you, other than by saying, well, they must have been, must be able to do something different. How did you counter that? So, two responses, Your Honor. The first is, that, that testimony, you, you can look, and you can ask Genentech. There is nothing specific that Swisher identified as requiring a change. The reason there's, all he said was there, the only way to do it would be to go through FDA approval, but he did not specify what specific change would be required, and why it would require FDA approval. And the reason is, they don't know. They never figured out what the problem was. That's number one. Number two, if you read that, that declaration, the affidavit, what you'll see is, is their, their characterization of the claims in this case are wrong. They say the claims would require us to make sure that it's an exact, it's exact at 440. Well, that isn't what these claims seek to do. These claims permit exactly, Judge McHugh, like you said, a variation. All they require is that if you are saying on your label, it's 4, you can withdraw 440, then you need to be able to withdraw 440. That's, that's the, that's all that these claims seek to do, which is consistent with the way the FDA itself understands this regulation. Now, I just want to, Let me, I want to make sure I understand. So, one way that you're saying you could do that without FDA approval is to raise the level of the, what I'll call the drug protein, T, as my colleague calls it. The other way, as I understand it, would be the concentration of the drug substance. Correct. So, that would be, have to do with, well, you tell me what you call drug substance. So, you can either increase the target drug substance concentration, and I'll give you a specific example. In the appendix at 1662, the Singapore facility did exactly that. To get up, they did not seek FDA approval. Or, you can increase the target fill weight, which is how much drug substance goes into the vial. And, I'll give you an example. It's at appendix 1659. The pathion facility in 2014 increased the minimum target fill rate without FDA approval. Both ways would allow Genentech to accomplish this minimum amount without going through FDA approval. Well, there's also the question of change in manufacturing processes. Again, Swisser tells us it's going to be really difficult. Yes, but again, without any specificity, the burden here is on Genentech to come forward and show with clear evidence that there is no other way for them to comply. I'll make one final point before I'd like to reserve the rest of my time for rebuttal, and it's this. Even if it were true that Genentech couldn't manufacture every vial, every single vial that would meet 440, that isn't, at itself, enough to demonstrate a possibility, because the claims in this case are only focused on the vials that are sold to the public. So, the existence of some vials that might not meet the standard itself is not enough. It's only about the vials that go out to the health care providers in this case, and ensuring that those vials themselves can permit withdrawal of 440 is entirely consistent with the regulatory scheme and wouldn't require any additional approval. With the courts, I'd like to reserve the rest of my time for rebuttal. Thank you. Ms. Donohue, I'd like to start you out with a question, which is, there's record evidence that, for a period of time, whatever was happening was resulting in a extraction level of the drug protein much higher than what was done in the later period, and there's no evidence that there was any FDA approval required to make whatever change happened happen. Isn't that pretty serious evidence that you could go back to what you were doing before, without FDA approval? Your Honor, that's a great question, and thank you. I think that the just saying, I think that the just saying, I think that the average fill closer to 440 or at 440, the reality is that because this manufacturing process is highly complex, fraught with variables at every step of the way, that is why the specification is as broad as it was, and why the FDA has approved that specification and allowed Genentech to continue to manufacture within that specification, despite the fact that the FDA has approved new facilities, seeing that the spec, I'm seeing that the fill is far below 440 at times in sample batch records. The FDA knows and continues to approve this broad specification because it is absolutely essential. Wasn't there a consistent, once you drop down, a consistent drop down? It wasn't Tuesday it was 440, and Friday it was 312. I mean it was, once it went down, it stayed down, right? And some, because somewhere, and probably at multiple steps within the process, from taking, you know, from cell duplication and replication, through freeze-drying, through filling, and everything else, it happens. If it's a complex process, and there are a lot of variables, it would seem to me that over time these variables would be more evident, as opposed to seeing a long period of time where there was a, I won't say a flat line, but at least a reduction that was consistent. Your Honor, I would say that in a process such as this, the variables are a change from time to time. You can't pinpoint, oh at this point in cell replication, this variable occurs. I mean, it is a highly complex scientific process. Don't your internal emails belay that? I mean, you've got emails where you're discussing, how are we going to get to the level of extraction that we want? And the methodology is that we're going to fluctuate within the range that was already approved by the FDA, and that affects the outcome. I mean, it, and that is something I don't think the district court ever even considered, is whether you could fluctuate within that range without needing FDA approval. What Genentech has always done has targeted a fill weight of 443 milligrams per vial. But your target is 440, isn't it? No, the label says nominally 440. The FDA, at the time of approval, concluded that 440, nominally 440, means 440 plus or minus 435, because the FDA concluded that that range was necessary and essential for this biologic, life-saving biologic, to get to market and for Genentech to be able to manufacture it. And for a decade, you were on the plus side of that range, and now for a decade or whatever it is, you're on the minus side of that range. And it, it, all indications are that there was a conscious decision to move from this area to this area, and it looks like it can be done without FDA approval. Your Honor, I think before we can, or you can, conclude that there was a conscious decision on the part of Genentech, you have to consider the fact that the FDA reviews regularly and inspects our plants regularly and, and, and under CGMPs, under regulations, that good manufacturing practices are in order, and what they look to see is if there is any intent on the part of the company to not get to that 100% rate. And they concluded over and over again that by targeting 443, we are, our intent is to try to get as close to 440 as we can. So, so if you satisfy the FDA, game over. We don't care about anything that could be brought in state litigation to police what the manufacturer is doing. I believe in a case with, like this, where you are dealing with an incredibly complex biologic, and Congress has authorized FDA to approve. So you're saying there's an exception for biologic that would not permit us to apply Wyeth? I am saying that Wyeth shouldn't apply in this particular case, because this is a purely commercial case dealing with the manufacturing process, yes, of an extremely complex biologic. I do not believe that state legislatures or state juries can out expertise the FDA in terms of what is appropriate. So you're saying that, that the FDA sets not only the floor, but also the ceiling? Yes. Well, that's contrary to, where, what do you rely on to say that? Because the FDA, because the FDA approved a floor and a ceiling in this case, as it's, as it's authorized to do by Congress, and as it determined was necessary for this product. We would have to say, we would have to agree with you on preemption to agree with you that the FDA sets both a floor and a ceiling, right? I'm sorry, Your Honor, I'm not, I'm not tracking you. Well, I, why wouldn't we, if we can, hold you to both state law and federal law? Because in this case, if you, if you, if the state law that you're seeking to hold Genentech to is a minimum of 440 in every vial. That's not what they're arguing, is it? That is what they're arguing under, under the imposs, their impossibility argument. They're, they're arguing you're going to have variation, and, but, but they want to go back to where you were mostly at 440. What, what they want, what they are arguing is you're going to have variation, but the variation can only be above 440. It cannot be below. And what I would say is under, that's basically, and I guess then they take it one step further and say, and that's really not preempted because guess what, Genentech, you can still sell your, your 440 and above, you just can't sell your, your below 440 product. And what, then that is directly contrary to the Bartlett case. That's basically a C selling argument, and it doesn't matter that, oh, you can sell that product elsewhere, but just not in the state of Oklahoma or wherever else these cancer clinics are doing business. What, what do we do, what do we do with the debate whether this is a solid or liquid drug? Well, my understanding is that, that, that the plaintiffs argued it was a liquid in the lower court, and that did not raise that issue on appeal. But I believe Judge Kern was correct in, in finding that it was a solid. Well, in order to, to address preemption and whether or not there's an obstacle in the enforcement of state law versus federal law, we have to know where to start. And to know where to start, we need to know what federal regulation applies, and that would engender us to know whether it is a liquid or a solid. Your Honor, Herceptin is clearly a solid. FDA doesn't think it is. Yes, it does. 2014, they said absolutely it's not, and they said you need to change your labeling. I'm sorry, I misspoke. As, as, as of the, the final guidance in 2015, they, they're, that they're thinking on that change. But prior to that... Well, they say their thinking didn't change. They say that that's always been their thinking. Well, I, I think that the FDA, that their thinking definitely changed, as is evidenced by the fact that they regulated it, approved it, and regulated it as a solid drug for up until 2015, and then when the guidance became final. In addition to that, FDA had proposed labeling changes from Genentech in its possession since 2014, approved during the time from 2014 to 2017, approved two additional label changes, and did not invoke the change that Your Honors are speaking about. And then in 2017, when they told Genentech, you need to change your label, we did so immediately. So if the FDA had... I thought you stopped selling multiple vial, withdrawal vials. I thought what you, what you did to change was basically change the way you delivered the drug. No, Your Honor, what was going on was the Genentech made a determination that rather than continue to sell in multi-dose vials, it would go to a 150 single-use vial. But it was still selling the multi-use vials because they, they, they, they had, they had a stock to still sell. So they submitted labeling to the FDA for the 150, and it, and the one 440 was part of that. You know that there, so there were two dosages, I mean two vials, and they, there were two separate labels submitted together. The FDA at that point said, change your label to 420 for the 440 to be consistent with what they were doing with the 150. Well, to also accurately reflect what you could actually withdraw from the vial and use with a patient. Well, I mean, the FDA and the telephone conference made it pretty clear that they did not think the label was subjective. Submitted, proposed new labeling, which it is required to do as we explain under impossibility preemption, impossibility preemption argument. We could not make that label change without prior FDA approval. So we gave it to the FDA and said, here's what we'd like to say. They did not respond to us until 2017, at which time they made our change. Could you address in the record the two different pieces of testimony I pointed to earlier, Mr. Swisher, or Ms., I'm not sure, and, and Dr. Lynn? Because as I'm understanding it, you're suggesting that, well, the fact that you were achieving the 440 average early on doesn't, doesn't mean that you can now. But you still have to show us, don't you, that that would require a change that would require FDA approval to meet it now, and I'm wondering where in the record you've established that. I think providers counsel suggests that that testimony that you pointed to doesn't really, if you get right down into it, doesn't really make your point. I would say, Your Honor, that Mr. Swisher's declaration speaks in some detail to the changes to the manufacturing process that would be required. He talks about, I mean, basically what the plaintiffs, what it is, is it's a bell curve. We target 443. There's a lot over here, there's a lot over there, by virtue of the process itself. What the plaintiffs would like us to do is to move that, move the curve somewhere, so that you're always at 440 or above, and Dr. Swisher explains that if you do that, you, you're going to lose your bottom limit. I mean, you can move your bottom limit, but then your top limit is going to, is going to go up, and we're going to be outside of the specification. If we go outside of the originally approved specification, or if there's a chance we will, I should correct that, if there's a chance that we make a change, or we want to make a change to a manufacturing process. But where's the proof that you actually have to move the top limit? That's one. Dana Swisher's declaration. Just because he says so, does he explain why? Because he says so, and there's also, and I can cite you to the record part in it, there is a series of slides when Genentech looked at just this issue, there's a series of slides from a scientist at Genentech where she looked at it every which way to determine if they could, if they could, you know, get closer to 440 every time, and she did a whole presentation on it, and then it went, it showed that we couldn't possibly do it without going back to for FDA approval, and that is at the record at volume 122920. It's the series of slides by Dr. Weber. If you targeted 444 instead of 443, would you move it up, but not end up with a whole lot that you couldn't sell? I'm not a scientist, I don't know, but I assume so. Well, don't you have to know to prove impossibility? I assume so, based on Dr. Swisher's declaration, Your Honor. That's not consistent with the emails that indicate that you were playing around with these ranges to affect what you got in the final product. Let me ask you this, you have three facilities producing this? Yes. Do they all have the same fill rate required, target? They all have the same target, but where they end up is different. They fill at different rates, don't they? They target 443 consistently. I'm now talking about a different fill, you know, these, the briefing and everything is all over the place on what we're talking about. I'm looking now on how much you fill the drug product. My understanding, Your Honor, is that the machinery that ultimate, that is used in the ultimate fill, the machinery has different Calibrations. Yes, thank you, different calibrations. But they actually have different targets per plant. I mean, that's in the record. They vary between 2.2 percent depending on which one you're looking at. They're not the same. Well, the overall fill rate is, the target fill rate is the same at 443. That's what I'm talking about. I'm not talking about 443. You're talking about the drug, the concentration? I'm talking about the vial fill rate. The vial fill rate is different plant by plant. And you didn't need FDA approval to do that, right? Because you could vary within a range. No, we did need FDA approval to do that, Your Honor, because every time we open a plant, we go and get a post-approval supplement for that plant and that target fill rate based on the machinery that's at that plant. So the FDA approves any difference in target fill rate, drug substance concentration, or whatever there is, you know, at the time we open the plant. I think I have about 15 minutes left, if I could just, it's 15 seconds. I'm sorry. I'm over time. Oh, is there anything else I can answer for you? Any other questions from the panel? Seeing none, thank you. Thank you. Just very briefly, Your Honors, what you heard there was a classic case of an advocate asking this court to disregard controlling Supreme Court precedent. Genentech wants you to rule that FDA approval alone exerts preemptive force. But if there's anything that we know about the FDCA from Wyeth, from Merck, it's that FDA approval alone is insufficient to exert preemptive force because Congress intended state law to act in You don't just have to take the Supreme Court's word for it. This court in Cervini also made the same exact point. A drug's regulatory history, the FDA's decision to approve a particular label, is not enough to wipe off the table state laws that would even do more than what the federal law floor requires. I also think, just to respond, Judge Merck, to your question about the Swisher Declaration, it is entirely conclusory. You asked specifically where in the record does anybody, Swisher, anyone, specifically identify a change that would be the only way Genentech could comply with the state law obligations, and you didn't get an answer. And the reason is because there is nothing in the record. What about the slides? The slides don't actually identify the specific change that would require FDA approval, and there's a reason why that's true. It's because Genentech, Swisher, corporate, the corporate officials or investigators did not actually undertake any investigation to determine what the problem actually was. Without knowing the problem, they cannot meet their burden here to show the only way to fix the problem is through FDA approval. When you couple that with the clear evidence of Genentech's ability to meet this standard going back a decade, plus its ability to continue to fix the target fill rate in various facilities, you have, I think, a clear case of a defendant who has failed to meet the demanding burden. And in the case where the defendant has failed to meet that burden and impossibility, there is no preemption. And you can look at the Third Circuit's recent decision in Avandia, which came out after Merck for a good, I think, set of guideposts for how that's supposed to work. Thank you. Thank you both for your arguments this morning. The case is submitted.